We'll hear our first case, which is Murphy v. Cayuga Medical Center. Good morning. Good morning. May it please the court. Erin Torsello of Bonshenick and King on behalf of Appellant Cayuga Medical Center at Ithaca. Injunctive relief is an extraordinary remedy. This is especially true whereas here the imposition of an injunction required a hospital, Cayuga Medical Center, to reinstate two registered nurses who were terminated following a patient complaint and an extensive investigation into their conduct. For knowingly and willfully failing to perform the final critical safeguard, which was the two nurse bedside verification. Is it disputed that, is it fairly disputed that the hospital has not really enforced this, and that you have this check here and that check there. And the third check at the bedside is done by one nurse instead of by two. It is extensively disputed as to whether or not the last, this bedside check is completed. It is the hospital's position that at the point in time that they conducted the investigation, they had no reason to believe that there was a widespread failure to perform the bedside verification. The patient in this matter had had numerous, more than 20 blood transfusions, and each one of those, there were two nurses who conducted the two nurse bedside verification. So that's how the patient picked up the deviation. Exactly, exactly. But more than that, one of the reasons that we have appealed the district court's decision is because when the board submitted its petition, it did not sufficiently include record evidence to support its position that the verification had not been performed. Was there any record evidence that the medical center had not terminated other nurses who'd committed errors? The hospital had submitted affidavits from both management as well as doctors at the hospital, establishing that they did not know of a widespread violation of this policy. And in fact, the chief of the pathology department, who was unaware of the identity of the two nurses, opined that he felt that those two nurses, in light of the conduct, should not perform blood transfusions in the future. But I think the question was slightly different, if I may say so. I think the question is the disparity in the way they were punished or disciplined. They were terminated for this one time failure where there was no medically adverse consequence. I mean, there was evidence, it seems undisputed, that this was extreme when compared to the other forms of discipline that were meted out. I would dispute that there was any evidence submitted to the district court. There was a narration of facts submitted by the board that evidently was based on their own investigation, underlying investigation. But at the time the petition was submitted, they also moved the district court to consider the injunction on the basis of the underlying administrative record, which was ultimately never produced to the court because the court made its decision before the hearings were even complete. The court did have an administrative record of a prior proceeding, which does seem to be related. I mean, it dealt with Ms. Marshall. It did deal with Ms. Marshall, but it did not deal with this particular discipline, this particular patient, this particular blood transfusion. The ALJ decision was really used only for- What difference does it have to do with one particular blood transfusion if you don't check to see whether the person is getting their blood type? That seems to be important. Why would that matter from one transfusion to the other? That's a fatal mistake. It is a fatal mistake. The board, I assume, will say that that underlying ALJ decision, I assume we're talking about the first ALJ decision that was used to support the board's finding of union animus. That only goes to one of the three right line factors. So I would, it's my argument that as to the fourth factor, that is that these two nurses would have been terminated regardless of their protected activity. The board did not submit sufficient evidence for the district court to defer to their findings of fact. If there are no other questions on that point, I would like to move on to our second argument, which is that the court, which is that the court abused its discretion in finding that the injunction in this matter was just and proper. A 10-J injunction is an equitable remedy, just as any other injunction is equitable in nature. The just and proper standard, as indicated by this court, includes not only a consideration of the impact on collective bargaining rights, but it also incorporates the traditional notions, traditional equitable principles that we're all very familiar with when analyzing whether or not an injunction is proper. However, in this case, the district court focused only on the impact on collective bargaining rights in its just and proper analysis. And explicitly rejecting Cayuga Medical Center's argument that it must also consider factors beyond just the impact on collective bargaining rights. This is not to say that collective bargaining rights are not important rights, but that is to say that there are other important public interests and particularly that should be considered when deciding whether or not an injunction is just and proper. Suppose the hospital was happy to get rid of an active union supporter. And the person they got rid of is a nurse who does not sufficiently assure the correct blood type. Are you saying that they can, what happens there? I mean, what trumps what? Well, I would argue that patient safety and ensuring quality care of patients and avoiding death to a patient should trump collective bargaining rights. I mean, it needs to at least be considered. I would say that- Was that a real issue here? I mean, the reinstatement of these two nurses who otherwise, and I think it's undisputed, had pretty spotless records for a one time failure. Was there really any harm? And I think it was considered by the ALJ. Was there any real harm to the hospital based on the reinstatement of them? There was an affidavit submitted by Dr. Sotolofsky, who's the chairman of pathology, that indicated that if they were so reckless in this situation, he was concerned that this would happen again. And so it was his position, and these nurses, as they administer a blood product, they are administering that product under his license. And he was concerned that given the recklessness of their actions in this situation, that he was certain, or fairly certain, that it would happen again. And he was concerned to have these two individuals practicing medicine under his license, and the court never addressed Dr. Sotolofsky's affidavit. He had no idea who these two individuals were. And the court, while it had this affidavit in front of it, and made mention of it in its decision, the reason that it was mentioned was to say, I'm not considering it because what is important here is collective bargaining. Was that affiant the decision maker? No, he was not. My time is up. Can I finish my response to your question? I don't mean to. He was not the decision maker, but he was involved in the investigation, and his opinion was considered by the decision makers when they ultimately decided to terminate these two nurses. You've reserved a couple minutes. I have, yes. We'll hear you then. Thank you. Good morning. I'm Dorit Radzen for the NLRB. If I may, let me get right into some of the questions that you raised from Ms. Tercello. She claims that the facts here were extensively disputed. They are not. We all know that these nurses failed to do the second check at the bedside. And in fact, there is now extensive record evidence- You said the second check. It's like there are three checks. The bedside check is the third check. What they failed to do is have the second nurse do the bedside check. Exactly, come into the room. And we now know from the record, from this recent ALJ decision from Judge Graves, that this was a common practice in the ICU. All of the nurses who spoke to the lead investigator here told her that this was not uncommon in the ICU. That when they were busy or had other patients to attend to, they would do all of the proper checks outside the patient's room. And one of the nurses would enter. So none of that is in dispute at this point. Was that evidence before the district court? The regional director made sworn assertions, as you know. And our position, which I think is well founded, that is that the employer could have disputed that. The employer did not effectively refute that. They had one affidavit from the administrator who was involved in the, who led the investigation. And she didn't include anything about her conversations with the other nurses. The nurses who had testified before Graves told her, we told Debra Ames that this was common practice. And not only that, we know now from ALJ Graves' decision that it, they didn't follow up. Once they found out that this was common practice, if anything they did, they tried to tamp it down so they could go ahead and get rid of Marshall. When and how did they find out it was common practice? As soon as they- Before or after this patient complained. He was getting a transfusion with insufficient check that it was correct. Absolutely, it was after. However, normally in these situations- So then this is the first instance that the hospital would have had a deal with arriving at a penalty for this violation. Well, as in any hospital, there's going to be different things along the way. And we don't have an exact incident like this in the past, as you know. But when there have been other mistakes in, I'm sorry, go ahead. Now you're generalizing to mistakes. But I think we can agree, this would be a fatal mistake. And this is the kind of mistake that if they knew that Ms. Marshall did this and did not impose discipline on her. And it happened again, and the patient died, the hospital would be hit with punitive damages. It would be slam dunk, right? Well, that may be the case, but several years earlier, we know that there was a case where the wrong blood was actually brought to the patient. It was called, that was an actual near miss under the employer's definition. This was not a near miss. And in that case, the nurse was discharged, but only because she had a whole record of making a lot of mistakes. The other nurses who were involved were only re-educated or coached, which is the employer's common practice. What level of discipline would not be an unfair labor practice in this case? Could they have- A re-education. Suspended her? Suspended her without pay? Or would that be an unfair labor practice too? You see, you have to decide as between patient lives and administration of the hospital and the labor laws. Well, the hospital should have followed its common practice. If they had followed its common practice, which was intervening to re-educate and coach its staff, they have this whole thing called just culture in this hospital, where they're supposed to ask the employees, well, is this what happens? Tell us what the situation is, and they have a whole talk through. I can't- Aside from talking through, it would be an unfair labor practice to take any action against Ms- Marshall. Marshall, who's a union activist according to your papers. Right, right, according to our, and undisputed by CMC. Yeah, but- I mean, the facts of this case are so strong as to the employer's motive on the union animus, the prior ALJ decision, extensive evidence of animus against this union and against Ms. Marshall. On that basis, the district court had ample reason to find reasonable cause. We know that this was, she was this activist who they were trying to build a case against in the prior case, and here was their opportunity. Move to the other issue of whether it's just improper to require that somebody who doesn't do the second check at bedside before giving a transfusion cannot be disciplined or fired. If the hospital was really so concerned about this check, which I agree with you, to all of us seems quite important. Why did they not follow up and do something once they found out this was common practice? Well, they did do something. They fired somebody, presumably to encourage the others not to do the same thing. Right, but the lead administrator who was placed in charge of this investigation, who had never investigated this type of case before where there was no patient harm or even close to patient harm. She told her staff not to do anything about the evidence that the other nurses were saying this is common practice. Well, they can't fire all the nurses. They won't be able to run the hospital. So the question is, is it just to reverse the only measure that the hospital took, it's a tough one, I grant you. But to reverse the only measure that the hospital took in order to make plain to that nurse and to all the other nurses who were there, this is not going to be tolerated. I think it's called zero tolerance. But wasn't the district court's decision not only based on evaluating whether this was the only remedy, namely termination for what is acknowledged to be a serious failure. But the prior ALJ decision, a finding of hostility towards the union and also other declarations about practices there and the relative harm. I mean, that sort of went into the whole mix besides focusing solely on whether this was the only way to address this situation. Exactly, I mean, based on what the district court had in front of it, weighing the fact that Congress enacted section 10J just for a case like this. When employees who are active union organizers get fired, it's just improper to reinstate when the facts support that. Because the longer that employees don't have an active union organizer like this on the ground, they know that their rights are not being realized, they know that they're not protected. But the district court had very little in front of it at the time it made its decision as to how similarly situated employees were treated. Isn't that a fair portrayal of the record? It had the director's assertions, and the employer had an opportunity to refute that. And the director's assertions, this court has said on many occasions that these should be deferred to because that is the way this 10J was set up for. Deferred to the investigation which has been thorough and where there have been witnesses. And of course here, if I might remind the court, the region wanted to have that in the record. Nobody was trying to pull a fast one, and it simply got dropped. But there was always an attempt to bring not just the director's assertions, but the entire record. The question is now that the record is there, because we have Judge Graves' decision, what is the difference that CMC can point to to say, if they had had this. We have a very well reasoned ALJ decision on these facts. Looking at all of the lack of evidence of, excuse me, the evidence of disparate treatment and the continued hostility towards this campaign. And- I mean, cats don't like dogs, and employers don't like unions. And unions are not exactly high on employers either. So what does hostility prove? The question is, are there unfair labor practices? Absolutely, we know from the prior decision that was before the district court, there were violations that she would, that Marshall was unfairly, was illegally disciplined in the past. That's now been affirmed by the board. The whole board looked at that and said- It's referred to on page five of the blue brief. It says the NLRB investigated and issued its complaint on November 29, 2016. An administrative hearing in this matter has been completed, but no decision has been issued. Has a decision been issued? Right, that's the decision that was just issued in January from Judge Graves. That's now pending before the board. I see I'm almost out of time. Thank you very much. Thank you. We'll hear rebuttal. Thank you, there's just a couple points that I would like to address. Ms. Redson had mentioned Regional Director Murphy's sworn assertion in the petitions. I don't believe that his petition was verified in any way, shape, or form. I believe it, I don't believe it was verified, so I don't- It was accompanied by affidavits. But those affidavits only went to the just and proper prong. They had specifically not included evidence, affidavits, testimony on the reasonable cause prong, believing that the record would support their assertions of the fact. And Ms. Redson is right that it was anticipated that the court would consider the testimony put in front of the ALJ in the underlying proceeding. But as we know, the district court made that determination, made its decision before that happened. What do we do with the fact that we now have a decision from ALJ Graves that makes findings, and we have a decision of the board at this point? The underlying record of the ALJ decision, and I understand that the court could very well read that decision and defer to it. But I believe that the court has to go through that exercise. They are supposed to be the independent evaluator in these 10-J cases. Congress specifically required the regional director to go to a district court to independently evaluate whether or not a 10-J injunction was just and proper. What the district court ultimately does on remand, that's up to the district court. But the district court's job is not to merely rubber stamp the regional director's support in the record, and in fact I would say Hoffman requires deference only where there's evidence to support the regional director's assertions and factual theories. Thank you, thank you both. We'll reserve decision.